Case number 15-3470, Jack Calhoun Jr v. Life Insurance Co of North America. Oral argument, 15 minutes per side. Mr. Mary for the appellant. Good morning, Your Honor. Excuse me. Good morning, Your Honor, and may it please the court. In Glenn v. MetLife and again in Bennett v. Kemper, the court determined that the plan administrator unreasonably terminated a claimant's benefits. In large part because that plan administrator, which had assisted in obtaining and benefited financially from the Social Security Disability Determination, failed to give the Social Security Determination due regard in reaching its own disability determination. The Calhoun case that's before you today is on all fours with Glenn and Bennett and in fact is more compelling for three reasons. First, in Glenn and again in Bennett, the administrator terminated the claimant's benefits at the break between the own occupation and any occupation period. In this case, Lina concluded not only that Mr. Calhoun was disabled from his own occupation, it later concluded that he was disabled from any occupation. Second, Lina's any occupation determination was based in large part on a functional capacity evaluation that Lina arranged for. Lina picked the evaluator. Lina paid for the evaluation. The court has noted before in other cases that an FCE is about as reliable and objective a measure of a claimant's work capacity as is reasonably possible. Based upon the functional capacity evaluation, Lina conducted an administrative review and determined that there weren't any jobs available that would pay Mr. Calhoun approximately 48 grand a year. He just, because of the nature of his work, he'd been a laborer most of his life, he didn't have a lot of skills and he was substantially limited in sitting and standing. Lina also submitted that same functional capacity evaluation to the Social Security Administration. The ALJ in his decision talks about the functional capacity evaluation. He found the evaluator to be persuasive and the evaluation to be persuasive. Finally, third, the third thing that distinguishes this case from Glenn and Bennett and that in my judgment makes it a more compelling case, is we have Lina's own regulatory settlement agreement. That's the document that we've asked the court to take judicial notice of. Mr. Calhoun arguably is a beneficiary, a third party beneficiary of that agreement. It's certainly relevant to note in this case that Lina promised, and this was just two or three months before it made its final decision, Lina promised to afford significant weight to the Social Security determination. Why didn't you bring that up to the trial court if you wanted it to be? I wasn't aware of it, Your Honor. And my response to why it's not in the record and the whole argument about that, the purpose of limiting cases to the administrative record is at least in part so that a claimant presents all of his evidence to the insurer at the time and can't therefore sandbag the insurer later with, oh, by the way, if you'd have given me the chance, I would have shown this and this and this. This is something that Lina knew about, so we haven't surprised Lina. Lina surprised us. I didn't discover it until after we'd filed the appeal that the regulatory settlement agreement was out there, so that's why I've asked the court to consider it now. Can you tell me again, you were describing this regulatory settlement agreement, and you said that in that, Lina made a commitment to do what with the Social Security? It's Exhibit B to the agreement, and Lina says that it would afford significant weight. That's the language in the regulatory settlement agreement. And then the agreement goes on to talk about how it affords significant weight and how it distinguishes. This was not presented to the district court. Correct, correct. And I'd add along those lines as well, I think all the regulatory settlement agreement does is put flesh on the bones of this court's prior opinions because what the regulatory settlement agreement instructs Lina to do is give it weight and then explain how it should give it weight by distinguishing. For example, and I had several examples in our reply brief, there are reasons why a decision might differ from the Social Security decision. I argued the Morris case up here, which I lost, and the facts of Morris were that in, I think, 1995, the Social Security Administration determined that the client was disabled, and subsequently the plant administrator, I think that was a self-funded plant, arranged for both a functional capacity evaluation and an IME and determined that based upon that he was no longer disabled. The court held that the big gap in time and the fact that there was objective evidence that supported the change in position was legitimate. I've listed several. There are several. The treating physician rule is a good example. Had the ALJ in this case relied on the treating physician rule and had there been good competence for perhaps an IME on the other side, then Lina would have been justified in saying, yeah, we're not following this. What was the status of Dr. Vaughn? Is that a treating doctor? She's a treating doctor. Dr. Vaughn is a treating doctor. Who obtained her? Pardon me? Who obtained her? She treated Calhoun for quite a period of time. My question is, who obtained her? Did he obtain her or did Lina obtain her? He did. So this is a doctor that treats him that he has gotten and what Dr. Vaughn says is kind of damaging to his position, isn't it? I don't believe so because the statements from Dr. Vaughn's records are all before Lina made a decision that he was disabled. For example, she didn't want him to have a scooter because she wanted him up and moving. Was there any indication he wasn't fully trying when she evaluated him or was that another doctor? There's no indication from anybody that he wasn't fully trying. The functional capacity evaluation said he performed. Whatever it was. It said he gave good. Mr. Sechrist said that he considered the functional capacity evaluation to be fully credible. There's nothing in the record that shows that he wasn't trying hard when he was tested on what he could do. Correct. And Dr. Vaughn also sent him to a psychiatrist. I can't remember who it was. To assess whether or not he had any psychiatric components to his problem and the finding was no. So Dr. Basie says he's disabled. Dr. Vaughn's findings are essentially the same as what the functional capacity evaluation. Okay, but Dr. Vaughn earlier, and I understand this was before they determined that he was disabled, basically she took the position that he would benefit by pushing himself a little. Correct. And I think maybe there were others that sort of shared that, that he would benefit from pushing himself a little. I wouldn't be surprised. I mean, that's pretty common. Okay. So what about this conversation that's reported with, is it Bosie? I pronounce it Basie, but I'm not sure. I don't. Okay. Your guess is as good as mine. All right. So what about that? The conversation that Dr. Antonelli said, I talked to Basie and we agree that he has limitations, but he's not totally incapacitated or whatever the language was. I don't think anybody disagrees with that. I mean, there's a difference between I'm not totally incapacitated and I can work five days a week, 40 hours a day at a $48,000 a year job. I mean, I don't think that, setting aside the fact that it's a phone conversation that's. . . Well, then it's written up and it says that we agreed on the questions below. I mean, it would have been an odd document. Yeah, it is. But there's nothing there, I think, that's inconsistent with the position that we're taking here. I think the Elliott case from this court, which is a venerable case, says, yeah, you can't just say he can do sedentary work. What can he do? You've got to apply it to something. All of the evidence after the functional capacity evaluation, Leina did a transferable skills analysis, a TSA, right after that, and they said based upon the functional capacity evaluation, there aren't any transferable jobs. He's disabled from any occupation. After that, there was another transferable skills analysis that was an exploratory, which I took to mean if we can somehow ramp up his physical status, are there jobs that he could do so we could terminate his benefits? I view that fairly nefariously. The other two transferable skills analysis were all based upon the paper reviews. Dr. Trotter's review, he just totally rejected the FCE. He said the FCE was inexplicable, didn't say why. He said that Mr. Calhoun could do any range of light strength jobs. Needless to say, transferable skills analysis based solely on Dr. Trotter is going to say, yeah, there are a lot of jobs out there. What was disingenuous about Leina's decision in that case was it said that they had considered the Social Security decision and we had newer evidence. Well, there's nothing in the record that shows they considered it and there was no new evidence, unless you're counting Dr. Trotter's opinion. I want to track what you're saying to what the district court said because the district court was sympathetic with a lot of your arguments. Correct. It read like it was going to rule in your favor. I thought so to the end, Your Honor. Always good to read to the end. But at the end, he says, and it's thoughtful, he says let's look at the record of the whole in light of the arbitrary and capricious standard. And the arbitrary and capricious standard is deferential. It's not a rubber stamp, but it is very deferential. And the deference he describes is, is it based on a reasoned explanation and supported by evidence in the record? Not supported by all the evidence in the record, but there's evidence in the record to support the reasoned explanation. And then he says there are these four things which support it. One, two, three, four. I don't know if you have them in front of you. The FCE demonstrated plaintiff's capacity to perform some sedentary work. You're just saying that FCE was wrong. Well, no, no, no. I'm saying the FCE was fine. I'm saying that the line after the FCE said there aren't any jobs within his capability. So the district court was. . . He's right on the first point. He's wrong on the first point. Well, he's right that it said he had some. . . I'm out of time, Your Honor. I'd be happy to continue. Go ahead. Go ahead. Thank you. The FCE showed limited capacity. Nobody disagrees with that. That doesn't mean he can do five days a week, 40 hours. . . Five days, 40 hours at a job that pays $48,000 an hour. It's part of the record as a whole that he can perform some sedentary work. Correct. Number two, he says the opinions of the treating physicians that the extent of his pain could not be explained by objective evidence. Is that true? That's true. That's almost always true. That's clearly true. All right. So he's treating that. And then he says Dr. Antonelli's file review and Dr. Basie's agreement with Dr. Antonelli's assessment that plaintiff requires physical restrictions but is not totally impaired. Is that an unfair review of . . . Is that an unfair description of Dr. Antonelli's file review and Dr. Basie's agreement? I think it's unfair to credit Dr. Antonelli's review for two reasons. Number one, she disagreed with the functional capacity evaluation. Secondly, she didn't have the Social Security. And as I said before, with Dr. Basie, she agreed. I don't have a problem with . . . He talks about that. But there is a Dr. Antonelli file review which does assess that he's not totally impaired. Right. And four, the TSA, based on that review, identifies transferable sedentary occupations, does identify those occupations. So I take your argument to be, well, there is evidence in the record. It's just not enough. If I can make two points. Not enough and some of it's tricked up. If we go back to where the discretionary review comes from, the courts engage a fiction. The courts assume for purposes of deferential review that Lina is acting as a fiduciary, that Lina is neutral, that Lina doesn't have a stake in the game. When I first came on this court, I was amazed at the deference that was accorded in these kinds of cases. But now I've been on the court for over 10 years and it's pretty deferential. Well, I understand. You can't turn around and say, oh, no, it's not that really deferential because it's based on something that . . . Well, let me ask this, if I can break in just a minute. The deference is tempered by the recognition that there's a conflict of interest. Correct. So, I went through the district court's opinion to see if he was . . . if the judge was in fact taking into account the conflict of interest. I don't remember when he got to the end, if he factored that in. Was he still talking conflict of interest at that point or was he simply talking deference? He was simply talking deference. He did not consider that Lina is conflicted and has a financial interest in denying the claim. All right. And that was, I think, the point in Glenn or at least one of the points in Glenn. Clearly. And particularly as discussed by the Supreme Court. All right. Thank you. Thank you, Your Honor. Good morning, Your Honors. I'm Dan Sirsak. I'm here today on behalf of Life Insurance Company of North America. And I think that after listening to Mr. Mary's presentation, where I want to start with today is emphasizing that this is a case where the differences between the parties' positions are, in relevant part, are very, very narrow. We have a functional capacity examination which finds that Mr. Calhoun is capable of performing sedentary work, at least some levels of sedentary work. And the only difference between the medical evidence that Mr. Mary is putting forth on behalf of Mr. Calhoun is that Lina has conducted additional reviews of the medical evidence, reviewed surveillance video, and came up with two pieces that boost the medical capabilities beyond what is approved in the functional capacity examination. That is the ability to work a 40-hour week and the ability to drive. It's so conclusory. What are you basing that ability? No one has ever retreated from the position that he can't stand for more than a certain amount of time and can't sit for more than a certain amount of time. Well, the sitting and the standing restrictions, we have to remember in the functional capacity exam, the sitting restrictions fall within the range that goes up to 5 1⁄2 hours a day at the workplace, and the standing restriction is 2 1⁄2 hours and the walking restriction is 2 1⁄2 hours in an 8-hour workday. And where does that appear, Counselor? Those appear in the physical ability assessment form that was completed by the physical therapist, Mr. Sechrest, and submitted to Lina along with the... I thought Sechrest was the one that said he was not able to work. No, that's not what Mr. Sechrest said. Mr. Sechrest's functional capacity examination is the basis for determining that he is capable of performing some sedentary work. And if we look at this file... You know, that's sort of the problem, some sedentary work. The question is how many employers are going to put up with somebody who every hour is going to have to take a 15-minute break or a 5 or 10-minute break and just, you know, go somewhere and lie down or something. So some sedentary work doesn't do it for me. If somebody else comes along and says, well, this person said some sedentary work and therefore he can work a 40-hour week and drive, that's their opinion, but it wasn't necessarily what Sechrest meant. I'm looking for... Well, Your Honor, if I could direct your attention to the definition of disability in the policy, Mr. Calhoun is required to prove, the burden of proof is on him, he's required to prove to Lina that he's unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training, or experience. And so it's Mr. Calhoun's responsibility in order to receive these benefits to demonstrate that he can't perform any occupation. And it's not Lina's obligation to come forward with evidence that he's able to perform the full array of sedentary occupations, and that's a distinction that we can draw with... He doesn't have an FCE that says he can't, right? No, the FCE does not say that he cannot work. Why did you award him benefits? He was awarded benefits for the first 24 months under the own occupation standard. You awarded him benefits for any occupation also, didn't you? Benefits continued for three months under the any occupation standard while his file was being reviewed by the Special Investigations Unit that conducted the surveillance video that was taken in September of 2012, I believe it was. And so it is absolutely... How does your standard differ from the Social Security standard? Well, if we look at the decision by the Administrative Law Judge, I think it illustrates the difference very clearly. First, to begin with, I have to disagree with the premise that there's any conflict between the allowance of Social Security disability benefits on April 23, 2012, and what Lina has determined. Because at the time that the Social Security Administrative Law Judge approved those benefits, Mr. Calhoun was receiving benefits from Lina. In order to be eligible for, on the first page of the Social Security decision, the Administrative Law Judge explains that in order to be eligible for those Social Security disability benefits, an individual must have a disability or an impairment that can be expected to result, or that has lasted or can be expected to last for a continuous period of not less than 12 months. And so anything that happens with respect to the application for Social Security disability benefits or the proof of disability is going to that standard of whether Mr. Calhoun was disabled for 12 months or more. And Lina doesn't contest that he was. Excuse me, but there is evidence in the record that he wasn't improving. Is there not? No, there's no evidence in the record that he wasn't improving. This is a case where, despite the burden of proof being on Mr. Calhoun to come forward with medical evidence, he never went out and got a decision. Excuse me, Counsel. Go ahead. Somewhere in this I saw that some doctor's report came back that he was not improving, and you're saying that that is not in the record? I'm not aware of any formal evaluation of Mr. Calhoun that found that his condition was not improving. Okay. Let me go back to Sechrest a moment. He's the one who did the functional capacity evaluation. He observed that Calhoun occasionally could lift or carry certain amounts of weight but could not frequently carry even negligible weight. Sechrest further observed that Calhoun, quote, exhibits limited tolerance for sustained sitting or standing and limited tolerance for various mobility tasks such as walking, stooping, kneeling, and climbing stairs, each of which he is able to perform on no more than an occasional basis. And he concluded, based on analysis of his performance and my clinical observations, I believe that he will require at least one break every hour for five to ten minutes from sustained sitting, and his standing tolerance is even more impaired than his sitting, for which he tolerates approximately 15 to 20 minutes without external support or breaks to sit. Yes. Yeah, so there's no question that the... And out of this, somebody doing a paper review decided that he could work 40 hours a week, five days a week, 40 hours a week without any problem. His treating physician spoke with Dr. Antonelli, who was conducting the file review, discussed Mr. Calhoun's case with the file review physician, and the treating physician agreed that he was able to work within the limitations of the functional capacity exam and work a 40-hour week and drive. And so when we talk about... Are you saying the doctor agreed he could work a 40-hour week and drive? That's what the record indicates, absolutely. Because that's what Dr. Antonelli's report, back to Lina, says, is that Dr. Antonelli consulted with Dr. Boese, however we're going to pronounce her name, that they consulted and that the answer provided in the medical file review about what the capabilities were was discussed with Dr. Boese and agreed upon by her. And that's how we get to this, you know, why did Judge Watson at the district court reach the conclusion? That's what he relied on. Well, absolutely. I mean, I think that the file review on its own would certainly be sufficient under Sixth Circuit and other authority. Well, let me ask you this. Dr. Boese, what I got out of this was Dr. Antonelli stated that she spoke with Dr. Boese and that they, quote, agreed that he needs restrictions but is not totally impaired, unquote. Isn't there a difference between totally impaired and disabled from doing any occupation? Totally impaired leaves you just unable to do anything. Well, I certainly... Because the ALJ had already found that he was totally disabled. Well, that's not exactly what the ALJ found. What the ALJ found is that Mr. Calhoun, he didn't have the residual functional capacity to perform the full range of sedentary occupations because his limitations, and I'm going to read from the ALJ's decision, the vocational expert testified that while claimant's need for a cane while ambulating eroded the sedentary occupational base, his need for a rolling walker to balance while standing, et cetera, et cetera, further eroded the sedentary base as his inability to use both hands would preclude him from performing essential functions of sedentary work during that time. And so what the ALJ is saying, if you go back and you read, that in order for the ALJ under Social Security standards to find Mr. Calhoun was not disabled, he would have been required to show, the ALJ would have been required to find, that he could perform the full range of sedentary occupations. The standard under Social Security is very different from the standard in this policy. How many Social Security Administration cases have you handled, Counselor? I don't litigate any more. Well, we see them all the time. So maybe you want to try to educate us about Social Security, but we basically know how difficult it is to get an ALJ to say that you're disabled from working and to award disability benefits. And that thing that you just read me, what he found, I mean, this guy is on a cane, he's on a walker, he can't maintain his balance. You know what, Your Honor, I think that if you read the ALJ's decision and you look at the facts that the ALJ believed to be true, and then you compare the facts that the ALJ believed to be true and wrote in his opinion to the surveillance video that was taken several months later, it is perfectly clear that the things that Mr. Calhoun apparently testified to before the Administrative Law Judge were not true. He testified and the Administrative Law Judge found as fact that Mr. Calhoun was unable to work, or unable to walk more than 40 feet without sitting down to rest. The surveillance video shows that that is not true. The Administrative Law Judge... Well, let me just tell you my feeling about the surveillance videos. You don't know, and neither do I, that after this activity that turns up on this film, 30 seconds here and 2 minutes there, you don't know that he didn't go home and take a Percocet because he was in such pain. You just don't know that. So to put that much trust in what comes up on these little 3-minute or 2-minute or 5-minute video things seems to me... And they're not in the record, are they? There's a report, as I understand it, of what... No, the video is in the record. Is it really? Absolutely. I thought that the doctors who were familiar with what the video showed had not seen the video but had only seen the report by the photo facts people that took the videos. Am I wrong about that? I don't know the answer to that question offhand, but I believe that they reviewed the video, and what I do know to be true is that in these cases the decisions are not made by the physicians. The decisions are made by the claims administrator, and the claims administrator reviewed the entire file. So the administrator reviewed the video, and I believe the physicians... And the claims administrator is a LIHNA employee, is that right? Oh, absolutely. Okay. Yep. And I think that... I guess the other point I would like to make about the 5- or 10-minute video is that the physical activity that an individual will show in a physician office visit... I think all of us have experienced physician office visits where we go in and you don't necessarily get more than 5 minutes with a physician. And so to say that watching Mr. Calhoun lie down on his back and work underneath a rotting lawnmower changing out the parts is every bit as valid as watching him climb up onto the exam table or ambulate into the exam room. And I think that it's also important to note that we've got this video that shows him capable of doing things that the administrative law judge flat out found that he couldn't do. In the video, he is standing without a cane or a walker. He's using his hands at the same time. He's operating the jack to lower the rotting lawnmower. He's holding the jack in his hand. He's walking with a cup of coffee. All of these things are things that would be inconsistent with what the administrative law judge found in this case. And it goes to the validity of Lina's decision that they had more recent evidence than what was available to the administrative law judge when he made his decision. So I think that's an important point to remember. And I guess it looks like I'm coming up on my time. I'd like to close by saying that what we're looking at here is a very narrow difference between Lina's view of the medical and what the plaintiff's view is. And I'm sure the plaintiff's counsel may disagree, but that's a fact because the functional capacity exam was essentially adopted with a couple minor modifications. Time is up. Thank you, Your Honor. Thank you, Your Honor. I'll be brief. I just have a couple of points. First of all, to the extent that the video is in the record, I'd encourage you to look at it. Ninety hours of surveillance, less than 30 minutes of activity. And most of the activity with respect to the lawnmower, he was lying on his back. With respect to what? How did he get down? I guess I'd need to look at it. How did he get down on his back? He just ambled out there and laid down and fiddled with something with the lawnmower on his back. It was just the video isn't very good. You can't really see much. Plus, once again, as it. . . Read out the video. Okay. With respect to what Basie said, this is on page 334 of the record. Dr. Antonelli called Dr. Basie on five occasions and got office people four of the times. The fifth paragraph. This is the full substance of her report. I called again and spoke to Dr. Basie. We discussed the claimant's history, FCE results, and the surveillance video, and we agreed that he needs restrictions but is not totally impaired. Never talked about it. That's not the whole thing. She said, see questions below, which were discussed and agreement was reached. Even Dr. Antonelli, though, we're still talking. She found that he could do some sedentary work. We still have the problem under Elliott. What sedentary work? $48,000 worth a year? Finally, you can't divorce, in this case, the FCE from the transferable skills analysis that followed. The first transferable skills analysis that was based solely on the FCE said there weren't any jobs. That's why they determined he was disabled from any occupation. The only way they can read the FCE to support their claim is because the FCE is modulated by the lens of their reviewers. Modulated through the lens of their reviewers. They wrote a transferable skill analysis not based on the FCE after Antonelli but based on Antonelli's opinion. The only transferable skill analysis in the record that's based on the FCE is the first one, and that says there are no jobs. He's totally disabled. Finally, I would ask the court to look at what Lina's own representative told the Social Security Administration about Mr. Calhoun's disability. She made a passionate plea that now counsel is suggesting was fictitious. Thank you, Your Honor. What's the remedy? Send it back? I think the evidence is clear in Glenn that you can award benefits, partly because benefits are already awarded. So we don't have... In Bennett, the case went back for a remand because I think we were at the break. When you're at the break between the own occupation and the anti-occupation, I think there's a presumption that it should go back for review. I think once any occupation has been approved and conceded, then I think the proper remedy, barring some evidence that he's improved, the proper remedy is that benefits should be reinstated. I'm a little troubled by your reliance on this initial three months of benefits after the 24 months, which appears, I guess you could look at it, I suppose, as while we consider this more carefully, we're going to give you benefits. If you say, well, no company, no insurance company, if you give these benefits, then you're going to have a higher standard when you look at it more carefully. That's going to deter these companies from providing that kind of interim. I respectfully disagree. In my experience, insurance companies stop benefits while they review the anti-occupation, and benefits may stop for months and months and months. I've had benefits stop for as much as eight or nine months while they decide he's disabled from anti-occupation. And then they go, okay, we're convinced, and then they retroactively reinstate him. I don't think we're dissuading anything at all. I think what happened here is they decided it's anti-occupation, and then somebody at line has said, yeah, this guy's going to be on disability for 16 years. We need to take another look. But the case law up here is clear. They can take another look, right? Sure. They can always take another look. They can take a look. Well, in the Morris case, they clearly took a look. Under the scope of review, they have some discretion to say, well, on this record he has benefits, and now somebody else says under this record he doesn't get benefits. That could be upheld. If it's an agency matter, that would be no problem. I think that's fine, Your Honor, except for they're reviewing it on what I would call a jiggered record. They've got two file reviews that are questioning his credibility. They're questioning his pain. They could have sent him for an IME. They could have sent him for another functional capacity evaluation. I'm fine with all that. What I'm not fine with is we hire a review who disregards the actual evidence in the record and then says, oh, he's not disabled. I don't think you can do that under even an arbitrary and capricious standard review. The latter part of what you said, though, suggests that if you're right it should go back rather than he should just be awarded benefits. I respectfully disagree. I can't remember the case, but there's some case law up here that once benefits have been awarded and they should be reinstated. I think there's a difference at the any occupation, own occupation break. I clearly believe that. But I think once line is determined he's disabled, award the benefits, they can go back tomorrow and have a new FCE and say, you know, what's your status now? Well, are you basically saying that it should be the status quo? I think so. I think let's take the case back to the status quo. Thank you. But you're saying that there's nothing keeping them from re-evaluating, assuming we would have confirmed. Correct. They will have paid him for three years in the interim. Okay. Thank you. Thank you. Case will be submitted. Please call the next case.